**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE:<br><br>TYSON FOODS, INC., CHICKEN RAISED WITHOUT ANTIBIOTICS CONSUMER LITIGATION | MDL 08-md-1982 |
| Applies to:<br>All Actions | No. 08-CV-01643 (RDB)<br><br>**MASTER CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

This Master Complaint is being filed for administrative purposes to streamline discovery and class certification in the MDL Court. It applies to all class action cases pending in the MDL or to be filed in the MDL, but it does not supersede any existing or yet to be filed complaint. The underlying complaints in all actions are specifically preserved pursuant to MDL 1982 Second General Order – All Actions, Section IV A ("The parties do not waive and hereby reserve their rights to seek transfer of all actions to their respective transferor courts, or to districts where jurisdiction and venue are proper, at the conclusion of pre-trail proceedings."). Plaintiffs Mary F. Wilson, Andrea Dannell Johnson and Lisa Baxley (named Plaintiffs from *Wilson, et al. v. Tyson Foods, Inc.* -- referred to herein as "Wilson Plaintiffs"), and Mary Cutsail (named Plaintiff from *Cutsail v. Tyson Foods, Inc.* -- referred to herein as "Cutsail Plaintiff"), individually and on behalf of all others similarly situated, make the following allegations for the administrative purposes cited above:

## I.    <u>NATURE OF THE ACTION</u>

1)    This is a class action case brought on behalf of a nationwide class of consumers under the Amended Complaint filed in *Wilson, et al. v.Tyson Foods, Inc.* or, in the alternative, a statewide subclass of Maryland consumers under the Amended Complaint filed in *Cutsail v. Tyson Foods, Inc.*, against Tyson Foods, Inc. ("Tyson" or "Defendant").  The action seeks a refund of all or some portion of the moneys that class members paid for the purchase of Tyson chicken that was falsely, deceptively, and/or misleadingly promoted, labeled and sold as raised without antibiotics ("RWA"), when in fact it was not.  The action also seeks declaratory, injunctive, and all other relief allowed in equity and the law.

2)    Beginning in June of 2007, Tyson began a multi-million dollar marketing scheme to sell its chicken products as being "Raised Without Antibiotics" in order to seize on the opportunity to profit from the consuming public's growing demand for healthier and natural food products.

3)    In furtherance of its deceptive marketing scheme, Tyson marketed, labeled and sold its chicken as being antibiotic-free, while simultaneously administering antibiotics to its chickens on two occasions both pre and post-hatch.  First, Tyson administered Gentamicin antibiotics through injections to the eggs at the hatchery, and second, Tyson fed its chickens ionophore antibiotics after they had hatched. Tyson admits that it failed to disclose this information on its labels or in its print ads, press releases and advertisements touting these new products.

4)    As demonstrated below, Tyson's promotion, labeling and sale of its chicken as "Raised Without Antibiotics" or "Raised Without Antibiotics That Impact Human

5)      Purchasers of Tyson's RWA chicken products have been injured in that they would not have purchased these products and/or would not have paid the prices they did had Tyson disclosed that the chickens were not in fact "Raised Without Antibiotics" but were instead injected and fed antibiotics during the time they were raised.

## II.   PARTIES

### A.   Plaintiffs

6)      Plaintiff Mary F. Wilson is a resident of Ward in Lonoke County, Arkansas.  She purchased Tyson chicken on numerous occasions based upon Tyson's promotion and sale of its chicken as antibiotic-free.

7)      Plaintiff Andrea Dannell Johnson ("known as Dannell") is a resident of White County, Arkansas.  She purchased Tyson chicken on numerous occasions based upon Tyson's promotion and sale of its chicken as antibiotic-free.

8)      Plaintiff Lisa Baxley is a resident of Saline County, Arkansas.  She purchased Tyson chicken on numerous occasions based upon Tyson's promotion and sale of its chicken as antibiotic-free.

9)      Plaintiffs Wilson, Dannell, and Baxley are proposed class representatives for the Nationwide Class defined below.

10)     Plaintiff Mary Cutsail is a resident of Baltimore, Maryland.  She purchased Tyson chicken or chicken products on numerous occasions based upon Tyson's promotion and sale of its chicken as antibiotic-free.

11)   Plaintiff Cutsail is a proposed class representative for the alternative Maryland Subclass defined below.

   **B.**   **Defendant**

12)   Tyson, a Delaware corporation, has its principal place of business and headquarters at West Oaklawn Drive, Springdale, Arkansas 72762.   Tyson marketed and sold its chicken as "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Human Antibiotic Resistance" throughout the United States.

   **III.   JURISDICTION AND VENUE**

13)   This Court has jurisdiction over those actions originally filed in this District pursuant to 28 U.S.C. § 1332. As to those actions that the Judicial Panel on Multidistrict Litigation ("JPML") transferred to this Court, this Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1332, 1367, and 1407.

14)   As to those actions originally filed in this District, venue properly lies in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this District, Defendants transact a substantial amount of business in this District, or Defendants otherwise have sufficient contacts with this District to justify them being fairly brought into court in this District. As to those actions transferred to this District, venue properly lies in this District pursuant to 28 U.S.C. §§ 1391 and 1407.

## IV.   FACTUAL ALLEGATIONS

### A.   Introduction

15) Beginning in June 2007, Tyson began promoting its chicken and chicken products as "Raised Without Antibiotics" and/or "Raised Without Antibiotics that impact antibiotic resistance in humans."   In reality, however, Tyson used animal antibiotics known as "ionophores" and a human antibiotic known as "Gentamicin" in raising its chickens.

16) As such, Tyson's use of either of these products independently rendered Tyson's "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans" claims false, deceptive, and/or misleading.

### B.   Tyson Injects Chicken Eggs With Antibiotics

17) Based upon information and belief, Tyson vaccinates chickens, which were then sold fresh with the RWA label, in ovo against Marek's disease.

18) This process takes place in Tyson's hatcheries two to three days before the eggs hatch.

19) As part of this process, Tyson inserts a needle into its chicken eggs to create a hole and uses a separate needle administer the vaccine solution, which contains antibiotics, into the egg.

20) Gentamicin sulfate is an antibiotic Tyson injects into the eggs as part of this vaccine solution.

21) Gentamicin sulfate is approved for use in human medicine.

22) Tyson did not have approval from the United States Department of Agriculture ("USDA") to label any of its chickens "RWA" that were injected with antibiotics

23)     In a June 4, 2008 open letter to "Label Consultant Firms," the Food Safety and
        Inspection Service ("FSIS") stated that it "considers the injection of an antibiotic
        in ovo to render 'Raised without Antibiotics' or 'Raised without antibiotics that
        impact human disease resistance in humans' claims false and misleading."

        **C.      Tyson Provides Antibiotic-Laced Feed to its Chickens**

24)     Tyson's chickens are also raised with the use of ionophores.

25)     The,USDA, the Food and Drug Administration ("FDA"), and the American
        Veterinary Medical Association ("AVMA") are all in agreement that ionophores
        are antibiotics.  The, FSIS, an agency within the USDA to which Congress has
        delegated authority to regulate poultry labels, has confirmed this fact on several
        occasions to Tyson.

26)     In addition, the scientific peer-reviewed literature consistently refers to, considers,
        and treats ionophores as antibiotics.

27)     Ionophores are hydrophobic molecules that disrupt transmembrane ion
        concentration gradients, required for the proper functioning and survival of
        microorganisms.

28)     Ionophores, like other antibiotics, kill microorganisms in chickens, and Tyson's
        use of these antibiotics allows Tyson to achieve a more profitable production of
        chicken.

29)     Ionophores are used throughout the chicken industry to prevent coccidiosis, a disease caused by a protozoan-type parasite that lives and multiplies in the intestinal tract of animals, including chickens.

30)     The spread of coccidiosis is a significant concern in the chicken industry because coccidiosis causes severe symptoms like the inhibition of food digestion and nutrient absorption, dehydration and blood loss, and may cause death.

31)     According to testimony adduced, and findings made by the Court, in the *Sanderson Farms v. Tyson, Inc.* case ("*Sanderson Farms*"), as noted below, Tyson raised its chickens by feeding them ionophores.

###     D.      Tyson's Unqualified RWA Label

32)     On or about May 1, 2007, Tyson asked the FSIS to approve its chicken label that said "Raised Without Antibiotics."   While Tyson's application did not inform FSIS of its injections of antibiotics into the chicken eggs, Tyson's application did list three ionophores (salinomycin, narasin, and monensin) in the feed ingredient list.  Nevertheless, on May 16, 2007, the FSIS approved Tyson's application.

33)     On September 12, 2007, FSIS unambiguously informed Tyson that it had made a mistake and intended to revoke its prior approval of the "Raised Without Antibiotics" label.   According to a letter drafted on September 26, 2007 by Tyson's outside counsel, Nancy S. Bryson, the agency had "contacted Tyson [on September 12, 2007] to advise that FSIS had subsequently determined that approval of the ["Raised Without Antibiotics"] labels was a mistake and should be rescinded."  Therefore, as early as September 12, 2007, Tyson was on clear notice that FSIS believed it had made a mistake and intended to revoke its

34)     On September 19, 2007, Tyson executives, along with Ms. Bryson, met with FSIS

        officials.   After the meeting, FSIS permitted Tyson to formally respond to its

        concerns, which Tyson did by way of Ms. Bryson's September 26, 2007 letter.   In

        this letter, Tyson argued that "the record is conclusive: Ionophores are not

        antibiotics."

35)     On November 6, 2007, Philip S. Derfler, Assistant Administrator of FSIS, replied

        to Ms. Bryson.  In the letter, Mr. Derfler, on behalf of FSIS, stated that

        > [i]t is longstanding FSIS policy that ionophores are antibiotics and,
        > therefore, FSIS has not approved labels bearing a "Raised Without
        > Antibiotics" claim if the source animals were fed ionophores.  The
        > Tyson labels at issue were thus approved in error by FSIS staff.
        > Accordingly, we advised Tyson that FSIS intended to revoke their
        > approval. Your letter dated September 26, 2007, asks us to
        > reconsider this decision and to permit the continued use of these
        > labels.

36)     Mr. Derfler in that same letter formally denied Tyson's request for

        reconsideration:  "Because ionophores are antibiotics under the AVMA definition,

        FSIS will not change its longstanding policy regarding ionophores."   FSIS did,

        however, provide four different options to Tyson:  1) remove all "Raised Without

        Antibiotics" labels within forty-five days; 2) stop using ionophores in its feed

        formulation, in which case the "Raised Without Antibiotics" label would be

        technically accurate; 3) petition FSIS to initiate a public notice and comment

        process on the use of ionophores in poultry and meat; or 4) submit a revised label

        application.

37)     Furthermore, FSIS provided for a transition period for Tyson to remove the product label containing the "Raised Without Antibiotics" statement from the marketplace.  This transition period was expressly limited to the "label," not non-labeling materials such as shelf-dividers, shelf-toppers, and other point-of-sale materials.

### E.     Tyson's Qualified RWA Label

38)     On December 18, 2007, Tyson submitted an application to FSIS seeking approval of a revised label containing qualifying language.  On December 19, 2007, FSIS approved Tyson's application seeking permission to use "Raised Without Antibiotics that impact antibiotic resistance in humans" on its labels.

39)     On December 20, 2007, Tyson issued a press release reporting that Tyson and FSIS had agreed to the new label for Tyson's "Raised Without Antibiotics" chicken program.

40)     However, FSIS's approval of the new qualified label was based upon incomplete information.  Specifically, Tyson failed to disclose to FSIS that it injected its eggs with antibiotics.  Had Tyson disclosed this information in the first place, FSIS never would have approved the RWA label, qualified or not.

41)     On June 2, 2008, FSIS issued a letter to Tyson rescinding its approval of the "Raised Without Antibiotics that impact antibiotic resistance in humans" label because FSIS found that Tyson "routinely used the antibiotic Gentamicin to prevent illness and death in chicks."  FSIS notified Tyson that it must stop using any variation of a "Raised Without Antibiotics" claim by June 18, 2008.

42)     Under Secretary for Food Safety Richard Raymond said, "In contrast to information presented by Tyson Foods, Inc., FSIS found that they routinely used the antibiotic Gentamicin to prevent illness and death in chicks, which raises public health concerns."

43)     FSIS also stated that it "considers the injection of an antibiotic in ovo to render 'Raised without Antibiotics' or 'Raised with antibiotics that impact human disease resistance in humans' claims false and misleading."

44)     However, Tyson claimed that it defined the word "raised" for its labels differently than it is commonly understood by consumers.  Unlike the common understanding, Tyson claimed that the term "raised" referred only to the period after the eggs hatch, whereas Gentamicin was injected into the chicken eggs before the eggs hatched.

45)     Tyson admitted that the entirety of its $70 million marketing scheme for antibiotic-free chicken, as described more fully below, failed to disclose that Tyson had defined the word "raised" to mean from the moment of hatch to slaughter.  Because this definition was not expressly disclosed in Tyson's advertising, and is contrary to the common understanding of the word "raised," the Tyson's promotion, labeling, and sale of its RWA chicken has been false, deceptive and/or misleading, and therefore, unlawful.

   **F.     Tyson's Aggressive Marketing Campaign**

46)     In conjunction with receiving approval of its "Raised Without Antibiotics" labels, Tyson launched a multi-million marketing campaign to promote its chicken.

47)    On June 19, 2007, Tyson announced that it was producing all of its Tyson brand
       fresh chicken from birds "Raised Without Antibiotics" and would be holding a
       press conference that day.

48)    According to Tyson, it would start selling 100% All Natural™, "Raised Without
       Antibiotics" chicken that week.   Tyson stated that the product was being
       distributed nationwide in newly-designed packaging highlighting that the chicken
       was raised without antibiotics and contained no artificial ingredients.

49)    Quoting Dr. Lisa Hark, PhD, RD, a renowned family nutrition expert and author,
       Tyson promoted her statement that "now families can buy fresh chicken raised
       without antibiotics at their regular grocery store without a trip to an expensive
       specialty store.  And because Tyson is available across the country, this is news
       every family will care about."

50)    Dave Hogberg, senior vice president of Tyson's Fresh Meal Solutions, stated that
       "we are the first major poultry company to offer fresh chicken raised without
       antibiotics on a large scale basis and at an affordable price for mainstream
       consumers.  Because of the size and scale of our operations, we're able to convert
       our entire branded business and assure supply to our customers."

51)    Tyson initiated a multimedia marketing campaign that was internally termed
       "Project Sting."   A subsection of Project Sting, the "Thank You" campaign,
       placed significant importance on the "Raised Without Antibiotics" language.  The
       advertisements uniformly featured smiling children, often accompanied by a
       parent.  Many of the advertisements included a heading in large print declaring
       "Chicken your family deserves, raised without antibiotics."   Project Sting was

52)   Tyson reported overwhelmingly positive consumer feedback and believed this multimedia campaign was a large-scale success.   After conducting market research in the form of consumer reaction groups, Tyson Marketing SVP Hogberg relayed to coworkers specific consumer quotes that he believed "summarize[d] how this campaign makes people feel[.]"   Among the sample quotes was the following:   "It [Tyson's 'Raised Without Antibiotics' chicken] is safer chicken than others,"  and "[Tyson's 'Raised Without Antibiotics' chicken] has made me very happy as I am a cancer survivor and I believe that all the antibiotics and artificial ingredients contribute to this major disease."

53)   Tyson's data also indicated that nine out of ten consumers considered it important to have antibiotic-free chicken; in fact, it was the second most important claim that consumers looked for when shopping for chicken.   As a result of the advertising campaign, Tyson was able to substantially increase its chicken prices while, at the same time, increasing sales of its chicken by tens of millions of pounds.   The "Raised Without Antibiotics" advertising campaign was internally described as having a "dramatic" effect on sales.

54)   According to Tyson's own press release, "Consumer Insight, Product Innovation are Keys to Tyson Success" (Sept. 19 2007), "An example of Tyson's efforts to meet consumer needs is the company's new 100% All Natural™, Raised Without Antibiotics chicken, introduced in June.  The new product line, which includes all

55) Project Sting's success is also corroborated by the fact that advertisements containing the unqualified "Raised Without Antibiotics" claim remained in the marketplace months after September 12, 2007, the date on which the USDA clearly communicated that it had made a mistake in approving the label. Indeed, as late as November 30, 2007, weeks after the USDA refused to reconsider its revocation decision, Mr. Hogberg was telling other Tyson employees that "no one should be holding up anything because of the RWA labeling issue." Indeed, he was encouraging others to "GO! GO! GO!" onward with the campaign.

56) Tyson's continuation of Project Sting was carried out with full knowledge that the USDA intended to revoke the unqualified "Raised Without Antibiotics" label. That Tyson followed Mr. Hogberg's "GO! GO! GO!" directive is demonstrated by the fact that Tyson purchased additional television advertisements featuring the "Raised Without Antibiotics" language on September 27, 2007, to run through January 20, 2008. This decision was made despite the fact that the USDA had unambiguously stated its revocation of the unqualified "Raised Without Antibiotics" label.

57) Moreover, Tyson distributed unqualified point-of-purchase materials to supermarkets across the country.

58) Despite having constant communication with the USDA from September 2007 until December 2007, Tyson took no action to remove unqualified point-of-purchase materials from the market until February 28, 2008. On that date, Tyson

59)     Additional advertisements containing the unqualified "Raised Without Antibiotics" language appeared in other media outlets long after Tyson's original label was revoked by FSIS.  A billboard in Mississippi containing the unqualified "Raised Without Antibiotics" language, for example, was not taken down until mid-January 2008.

60)     Further evidencing the aggressiveness of its marketing campaign, Tyson began purchasing advertisements using qualified "Raised Without Antibiotics" language before FSIS approved Tyson's qualified language application on December 19, 2007.  For this reason, many of Tyson advertisements contain qualifying language that differs from the approved qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans."

61)     For example, the March/April 2008 edition of Weight Watchers magazine contains an advertisement using the language "raised without antibiotics that create antibiotic resistance in humans."  Other magazine advertisements and freestanding newspaper inserts purchased by Tyson after the revocation of the original label do not include the qualifying language immediately following the unqualified "Raised Without Antibiotics" claim.  For instance, in some advertisements, the unqualified claim was followed by an asterisk, leading the reader elsewhere on the page to a similar, but not USDA-approved, qualification typed in small print.

### G.    Tyson's Competitors Enjoin Tyson's Misrepresentations

62)    Tyson was sued by its competitors in *Sanderson Farms* over its "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans" marketing.

63)    Following a four-day hearing, this Court in *Sanderson Farms* found that the unqualified "Raised Without Antibiotics" language was false and that the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" language was misleading.

64)    The Court issued a preliminary injunction against Tyson directing among other things: "[Tyson] must remove any and all non-label advertisements … containing language claiming that its chicken products are 'Raised Without Antibiotics,' regardless of whether the statement has qualifying language such as 'Raised Without Antibiotics that impact antibiotic resistance in humans.'"

65)    Moreover, both plaintiffs' and defendants' witnesses uniformly testified that ionophores were antibiotics.   Dr. Bruce Stewart Brown, Perdue's Vice President of Food Safety and Quality, testified that it is indisputable that ionophores are antibiotics, as the scientific literature supporting this conclusion is voluminous and consistent.   Dr. Patrick Pilkington, Tyson's Vice President of State and Government Affairs, acknowledged that ionophores are antibiotics because the FDA classifies them as such.   And David Hogberg, Tyson's Senior Vice President of Product Marketing, also acknowledged that ionophores are antibiotics.

66)   Furthermore, in its testimony in *Sanderson Farms*, Tyson revealed that it technically defines "Raised Without Antibiotics" as meaning the period from hatch until slaughter, but this definition was not revealed in Tyson's USDA application for label approval.   In fact, upon information and belief, Tyson never told the USDA that it injects its chicken eggs with human antibiotics just before the chickens hatch.   Tyson did not inform the consumer public that it defines the term "raised," as not referring to the period before hatch, nor did Tyson inform the consumer public that it injects its chicken eggs with antibiotics.

67)   After the Court issued its injunction, on June 2, 2008, Tyson "voluntarily" agreed to take all RWA claims off of its labels.   But within hours of the announcement, the FSIS also ordered Tyson to cease the use of all labels containing qualified RWA claims by June 18, 2008. FSIS's statement reads:

> On June 2, FSIS issued a letter to Tyson Foods, Inc. rescinding the "Raised Without Antibiotics That Impact Human Antibiotic Resistance" label.  FSIS is required to ensure labels are not false and misleading. In December 2007, FSIS approved the qualified raised without antibiotics label based on information provided by Tyson Foods, Inc.
>
> The label is being rescinded based on additional information provided to FSIS only after the qualified claim had been approved. Specifically, FSIS found that they routinely used the antibiotic Gentamicin to prevent illness and death in chicks.  Because of this information, FSIS notified Tyson Foods, Inc. that the company must stop using the qualified raised without antibiotics labels, or any variation of a "Raised without antibiotics" by June 18.

68)   In a June 4, 2008 open letter to "Label Consultant Firms," FSIS stated that it "considers the injection of an antibiotic in ovo to render 'Raised without Antibiotics' or 'Raised without antibiotics that impact human disease resistance in humans' claims false and misleading."

**H.**     **Tyson's Wrongful Benefits Gained at the Expense of the Class**

69)    Plaintiffs have been misled, deceived and/or fraudulently induced into believing that Tyson's mass-marketed chicken was antibiotic-free when, in fact, Tyson fed its chickens ionophores and injected its chicks with antibiotics just as they were about to hatch.

70)    Tyson executives openly acknowledged that their claims to the public that their chickens were antibiotic-free permitted them to "price up," meaning that Tyson could raise the price of its "Raised Without Antibiotics" chicken without seeing a corresponding decrease in sales figures.

71)    Not only was Tyson able to use its false advertising to raise prices without suffering a diminution in sales, but Tyson in fact saw a substantial increase in sales volume at the artificially elevated price.

72)    As a direct and proximate result of Tyson's wrongful conduct, the members of the Class (as defined below) have been damaged by purchasing chicken or chicken products that were falsely promoted, labeled, and sold as "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans."

73)    Tyson knew that its chicken and chicken products were not "Raised Without Antibiotics" and not "Raised Without Antibiotics that impact antibiotic resistance in humans." In perpetrating its deceptive practices, it was Tyson's intention that consumers would rely upon these failures to disclose and false statements to an extent sufficient to allow Tyson to inflate its chicken prices and increase its chicken sales. Tyson succeeded.

17

74) Plaintiffs are not presently able to determine the extent to which Tyson's deceptive representations remain ongoing.  Upon information and belief, members of the Class continue to suffer injury for which there is no adequate remedy at law and will suffer irreparable harm in the absence of equitable relief.

## V.    CLASS ACTION ALLEGATIONS

75) Plaintiffs bring this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The requirements of Rule 23 are met with respect to the Class and alternative Subclass defined below.

76) Wilson Plaintiffs bring their claims on their own behalf, and on behalf of the following Class ("Nationwide Class"):

> All persons residing in the United States who purchased Tyson chicken or chicken products sold as either "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Human Antibiotic Resistance" between June 19, 2007 to present.

77) Cutsail Plaintiff brings her claims on her own behalf, and on behalf of the following alternative Subclass ("Maryland Subclass"):

> All persons residing in Maryland who purchased Tyson chicken or chicken products sold as either "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Human Antibiotic Resistance" between June 19, 2007 and the present.

78) The Nationwide Class and Maryland Subclass are referred to herein collectively as "the Class."

79) Excluded from the Class are any person, firm, trust, corporation or other entity related to or affiliated with Tyson, any entity in which Tyson has a controlling interest or which has a controlling interest in Tyson, Tyson's legal representatives, predecessors, successors, and assigns, the judicial officers to

80)     Plaintiffs reserve the right to amend or modify the Class definition in connection
        with a Motion for Class Certification and/or as the result of ongoing discovery.

81)     This class action is properly brought as a class action for the following reasons.
        The Class is so numerous that joinder of the individual members of the proposed
        Class is impracticable.  The Class, upon information and belief, includes tens of
        thousands of persons geographically dispersed throughout the United States
        and/or Maryland.  The precise number and identities of Class Members is
        currently unknown to Plaintiffs, but is known to Tyson and its affiliates and can
        be reasonably ascertained through discovery and other means, namely using
        records of sales and other information kept by Tyson, its affiliates and third
        parties.

82)     Plaintiffs do not anticipate any difficulties in the management of this action as a
        class action.  The Class is ascertainable and there is a well-defined community of
        interests in the questions of law and/or fact alleged because the rights of each
        Class Member were infringed or violated in similar fashion due to Tyson's
        misconduct.  Notice can be provided through records and publication, the cost of
        which is properly imposed upon the Defendant.

83)     Questions of law or fact common to the Class exist as to Plaintiffs and all Class
        Members, and these common questions predominate over any questions affecting
        only individual members of the Class.  Among the common questions of law
        and/or fact are the following:

19

a)      Whether Tyson advertised, marketed, promoted and/or sold its chicken as "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Human Antibiotic Resistance;"

b)      Whether Tyson actually used antibiotics in the process of raising its chickens that were sold to consumers;

c)      Whether Tyson's marketing campaign of RWA chicken was unfair, false, and/or deceptive;

d)      Whether Tyson failed to disclose to consumers that it injected its chickens, in ovo, with antibiotics;

e)      Whether Tyson failed to disclose to consumers that it fed its chickens with ionophores;

f)      Whether the alleged misconduct by Tyson violated laws as alleged in this Complaint;

g)      The duration and extent of any such unlawful conduct by Tyson alleged herein;

h)      Whether Tyson was unjustly enriched by deceptively marketing chicken as being raised without antibiotics;

i)      Whether Tyson's conduct was designed to induce Plaintiffs and the Class to purchase its products;

j)      Whether Tyson intended that Plaintiffs and the Class rely on its misrepresentations;

k)      Whether Tyson's omissions would be the type of information upon which consumers would be expected to rely;

l)      The amount by which Tyson's misconduct inflated the prices paid by Plaintiffs and Class Members for chicken or chicken products over the amount they would otherwise have paid; and

m)      Whether Tyson's conduct caused injury to Plaintiffs and Class Members.

84)    Tyson engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Class Members.  Individual questions, if any, pale by comparison to the numerous common questions that predominate.

85)    The injuries sustained by Plaintiffs and the Class Members flow, in each instance, from a common nucleus of operative facts – the Defendant's misconduct. The Defendant sold its chicken as RWA, when it knew (and failed to disclose) that it used antibiotics in raising its chickens.  The Defendant also did not disclose all material information to the USDA or FSIS until after its labels were approved by them, and Defendant launched an enormous marketing campaign with a message to consumers that its chicken was raised without antibiotics when it was not. Defendant's misconduct at issue occurred in Arkansas.

86)    Plaintiffs' claims are typical of the claims of the Class Members.   The Defendant's uniform, material misrepresentations and omissions and use of unfair, misleading, and deceptive business practices in the marketing and sale of its RWA chicken were equally presented to both Plaintiffs and the Class Members.  Moreover, the defenses, if any, that will be asserted against Plaintiffs' claims are typical of the defenses that will be asserted, if any, against the Class Members' claims.

87)     Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have no interests adverse to the interests of the Class Members and have retained counsel with significant experience in the prosecution of class actions and complex litigation, including consumer litigation, and who will vigorously prosecute this action.

88)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and individual joinder of all members of the Class is impracticable, if not impossible because of the large number of Class Members that are scattered throughout the United States.  Moreover, the cost to the court system of such individualized litigation would be substantial. Individualized litigation would likewise present the potential for inconsistent or contradictory judgments and would result in significant delay and expense to all parties and multiple courts hearing virtually identical lawsuits.  By contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves the resources of the parties and the court, protects the rights of each Class Member and maximizes recovery to them.

89)     In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) and/or 23(c)(4) because:

        a)      The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for defendant;

b)      The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c)      Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

d)      Some or all of the particular issues identified above are such that it is appropriate to maintain this case as a class action.

## VI.      <u>CHOICE OF LAW</u>

90)     Based upon information and belief, the major decisions regarding the promotion, labeling, and sale of Tyson's RWA chicken were made at Tyson's corporate headquarters in Arkansas.

91)     Tyson disseminated the bulk of its deceptive, misleading, and/or fraudulent information concerning its RWA products from its corporate headquarters.

92)     As the location of Tyson's corporate headquarters, Arkansas has the closest connection with the substance of the wrongs alleged to have been committed.

93)     Under Arkansas choice of law rules which should be applied to the Wilson Plaintiffs' Complaint, it would be consistent with due process for the Court to apply Arkansas law to the Nationwide Class in this case.

94) To the extent the Court declines to certify the Nationwide Class, under Maryland choice of law rules which should be applied to the Cutsail Plaintiff's Complaint, Maryland law should apply to the alternative Maryland Subclass.

## VII. CAUSES OF ACTION

### COUNT I

**Violation of the Arkansas Deceptive Trade Practices Act**

**(Nationwide Class Only)**

95) Plaintiffs incorporate by reference all of the foregoing paragraphs as if set forth herein.

96) The Arkansas Deceptive Trade Practices Act ("ADTPA"), Arkansas Code Annotated ("A.C.A.") § 4-88-101, et seq., is designed to protect consumers from deceptive, unfair, and unconscionable trade practices. The ADTPA is a remedial statute which is to be liberally construed in favor of consumers.

97) Specifically, as described herein, Tyson's wrongful actions relating to its promotion, labeling and sale of its supposedly RWA chicken violate A.C.A. §§ 4-88-107 and 4-88-108.

98) Tyson's sale of its supposedly RWA chicken is unfair, deceptive and unconscionable under the aforementioned code sections for one or more of the following reasons:

    a) Tyson knowingly made a false representation as to the characteristics, ingredients, uses, benefits, source, approval, or

certification of goods or services or as to whether goods were of a particular standard, quality, or grade;

b)     Tyson knowingly made material omissions as to the characteristics, ingredients, uses, benefits, source, approval, or certification of goods or services or as to whether goods were of a particular standard, quality, or grade; and,

c)     Tyson advertised goods with the intent not to sell them as advertised.

99)     As a direct proximate result of Tyson's deceptive conduct, Plaintiffs and the Class bought these products and, in particular, paid a premium for Tyson RWA chicken that was falsely promoted, labeled and sold, or purchased a product that they would not have otherwise purchased.

100)    Tyson omitted material information in its marketing and sale of RWA chicken products.  Tyson failed to tell consumers that it injected eggs with antibiotics and fed its chickens antibiotics.  This is the type of information upon which a consumer would be expected to rely in purchasing these products.

101)    As a result of Tyson's false and deceptive trade practices in violation of state law, Plaintiffs and Class Members have been injured.

102)    Tyson's unfair and deceptive trade practices amounted to violations of the aforementioned code sections, and proximately caused damage to Plaintiffs and the Class Members.

103)    Plaintiffs seek equitable/injunctive relief and/or damages on behalf of themselves and each Class Member for their actual damages sustained as a result of Tyson's

104)     Plaintiffs also seek statutory, treble and/or punitive damages on behalf of themselves and each class member as a result of Tyson's unfair and deceptive acts in an amount to be determined at trial, to the extent allowed under applicable law.

## COUNT II

### Breach of Express Warranty

### (Nationwide Class Only)

105)     Plaintiffs incorporate by reference all of the foregoing paragraphs as if set forth herein.

106)     Tyson warranted that its RWA chicken products were "raised without antibiotics" on its labels and in its promotions.

107)     Tyson's representations regarding its RWA chicken products became a part of the basis of the bargain that the goods would confirm to that affirmation.

108)     Plaintiffs justifiably acted in ignorance of the material facts Tyson omitted and concealed when they decided to purchase RWA chicken products sold by Tyson.

109)     Tyson has breached its express warranty to Plaintiffs and Class Members in that its RWA chicken products were not raised without antibiotics but were in fact raised with antibiotics.

110)     Tyson has been put on notice of its breach of express warranties to Plaintiffs and Class members through Plaintiffs' counsel, previous litigation, and governmental actions.

111)   As a direct result of the failure of Tyson's RWA products to be sold as warranted, Plaintiffs and the Class have been injured and incurred economic losses by paying for a product and/or paying a premium for alleged inherent qualities of a product that did not exist.

112)   Plaintiffs seek equitable/injunctive relief and/or damages on behalf of themselves and each Class Member for their actual damages sustained as a result of Tyson's breach of express warranty in a measure and amount to be determined at trial, as well as the costs of this suit and reasonable attorneys' fees.

## COUNT III

### Unjust Enrichment

### (Nationwide Class Only)

113)   Plaintiffs incorporate by reference all of the foregoing paragraphs as if set forth herein.

114)   Tyson received monies as a result of Plaintiffs' and Class members' purchases of RWA chicken products, and Tyson wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class members.

115)   Tyson's wrongful actions regarding its promotion, labeling and sale of its RWA chicken as described herein, were designed and indeed allowed it to make enormous amounts of revenue at the expense of unknowing consumers.

116)   Thus, Tyson has been unjustly enriched by its misconduct.

117)   Tyson should be ordered to disgorge all monies it has received due to its unjust enrichment.

118)   Plaintiffs and the Class Members who purchased the false and/or misleadingly marketed chicken are entitled to a refund of some or all of these purchase amounts.

## COUNT IV

### Violation of the Maryland Consumer Protection Act

### Md. Com. Law Code § 13-101, et seq.

### (Maryland Subclass Only)

119)   Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

120)   The Maryland Consumer Protection Act is designed to protect consumers from unfair and deceptive trade practices.  The Maryland CPA is a remedial statute which is to be liberally constructed in favor of consumers.

121)   As described in this complaint, Tyson's wrongful conduct relating to the promotion, labeling and sale of it supposedly RWA chicken violates Md. Com. Law Code §§ 13-301(1), 13-301(2)(i), 13-301(2)(iv), 13-301(3), 13-301(5)(i) and 13-301(9)(i).

122)   Tyson's sale of its supposedly RWA chicken is unfair and deceptive under the aforementioned code sections for one or more of the following reasons:

      a)   Tyson made false or misleading written statements, visual statements and other representations which had the capacity, tendency, or effect of deceiving or misleading consumers;

      b)   Tyson represented that its chicken products had characteristics, ingredients, uses or benefits they did not have;

c)      Tyson represented that its chicken products were of a particular standard, quality or grade which they are not;

d)      Tyson failed to state material facts about its chicken products and that failure deceives or tends to deceive;

e)      Tyson advertised its chicken products without the intent to sell them as advertised or offered; and

f)      Tyson used deception, false pretenses, false premises, misrepresentations, or knowing concealment, suppression, or omission of material facts with the intent that the consumer rely on same in connection with the promotion or sale of Tyson's chicken products.

123) As a direct proximate result of Tyson's deceptive conduct, Plaintiff and the Class bought these products and, in particular, paid a premium for Tyson RWA chicken that was falsely promoted, labeled and sold, or purchased a product that they would not have otherwise purchased.

124) Tyson omitted material information in its marketing and sale of RWA chicken products. Tyson failed to tell consumers that it injected eggs with antibiotics and fed its chickens antibiotics. This is the type of information upon which a consumer would be expected to rely in purchasing these products.

125) As a result of Tyson's false and deceptive trade practices in violation of Maryland law, Plaintiff and Class Members have been injured.

126)   Tyson's unfair and deceptive trade practices amounted to violations of the aforementioned code sections, and proximately caused damage to Plaintiff and the Class Members.

127)   Plaintiff seeks equitable/injunctive relief and/or damages on behalf of themselves and each Class Member for their actual damages sustained as a result of Tyson's unfair and deceptive acts in a measure and amount to be determined at trial, as well as the costs of this suit and reasonable attorneys' fees.

**COUNT V**

**Breach of Express Warranty**

**(Maryland Subclass Only)**

128)   Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

129)   Tyson warranted that its RWA chicken products were "raised without antibiotics" on its labels and in its promotions.

130)   Tyson's representations regarding its RWA chicken products became a part of the basis of the bargain that the goods would conform to that affirmation.

131)   Plaintiff and the Class justifiably acted in ignorance of the material facts Tyson omitted and concealed when they decided to purchase RWA chicken products sold by Tyson.

132)   Tyson has breached its express warranty to Plaintiff and Class Members in that its RWA chicken products were not raised without antibiotics but were in fact raised with antibiotics.

133)   Tyson has been put on notice of its breach of express warranties to Plaintiff and Class members through Plaintiff's counsel, previous litigation, and governmental actions.

134)   As a direct result of the failure of Tyson's RWA products to be sold as warranted, Plaintiff and the Class have been injured and incurred economic losses by paying for a product and/or paying a premium for alleged inherent qualities of a product that did not exist.

135)   Plaintiff seeks equitable/injunctive relief and/or damages on behalf of herself and each Class Member for their actual damages sustained as a result of Tyson's breach of express warranty in a measure and amount to be determined at trial, as well as the costs of this suit and reasonable attorneys' fees.

## COUNT VI

### Unjust Enrichment

### (Maryland Subclass Only)

136)   Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

137)   Tyson has received a benefit from Plaintiff and Class members in the form of the higher prices Plaintiff and Class members paid for chicken that was advertised as "Raised Without Antibiotics" or "Raised Without Antibiotics that impact antibiotic resistance in humans."

138)   Tyson appreciated and/or knew about the benefit it received from Plaintiff and Class members.

139)    Tyson received this benefit to the detriment of Plaintiff and Class members, and continues to retain this benefit to the detriment of Plaintiff and Class members.

140)    Under the circumstances, it would be unjust and inequitable for Tyson to retain this benefit.

141)    As a result of Tyson's unjust enrichment, Plaintiff and Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Tyson's enrichment, benefits and ill-gotten gains acquired as a result of its unlawful or wrongful conduct.

## VII.    DECLARATORY AND INJUNCTIVE RELIEF

142)    Tyson has acted or has refused to act on grounds generally applicable to Plaintiffs and the Class Members thereby making it appropriate to grant final declaratory and injunctive relief with respect to the Class as a whole.  Tyson engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Class Members.

143)    The Court should declare that Tyson's business practices relating to its promotion, labeling and sale of its RWA chicken were unlawful and deceptive.

144)    The Court should require Tyson to undertake a corrective advertising campaign notifying consumers that its RWA chicken claims were false, deceptive and/or misleading.

## VIII.    JURY TRIAL DEMANDED

145)    Plaintiffs and the Class demand a jury on all issues so triable.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that they and the other applicable Class Members have judgment entered in their favor and against Tyson, as follows:

a)      An order certifying the above-defined Nationwide Class, or alternative Maryland Subclass, pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their undersigned counsel to represent the Class;

b)      A declaration that Tyson is financially responsible for notifying all Class Members of the falsity of its previous representations;

c)      An award of compensatory, exemplary, and statutory damages, including interest thereon, to Plaintiffs and the Class for sums expended for chicken products Tyson sold "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Human Antibiotic Resistance" or similar words to that effect;

d)      An award of attorneys' fees and costs, as allowed by law;

e)      An aware of pre-judgment and post-judgment interest, as provided by law;

f)      A declaration that Tyson's conduct complained of herein is unlawful and prohibited;

g)      A declaration that Tyson must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of

RWA chicken or to make full restitution to Plaintiffs and Class Members;

h)   A temporary, preliminary and/or permanent injunction requiring Tyson to undertake a corrective advertising campaign; and,

i)   Such additional or different relief as the interests of justice, law, or equity may require.

Respectfully Submitted by Plaintiffs Steering Committee and Interim Class Counsel:

Dated: January 30, 2008

\_\_/S/_____
James P. Ulwick
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, MD 21202
Telephone: (410) 752-6030
Facsimile: (410) 539-1269

Scott E. Poynter
Chris D. Jennings
Gina M. Dougherty
EMERSON POYNTER LLP
The Museum Center
500 President Clinton Ave.
Suite 305
Little Rock, AR 72201
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

Daniel C Girard
Amanda Steiner
Christina H. C Sharp
GIRARD GIBBS LLP
601 California St Ste 1400
San Francisco , CA 94108
Telephone: (415) 981 -4800
Facsimile: (415) 981 -4846

Richard S. Lewis
James J. Pizzirusso
HAUSFELD LLP
1700 K Street, Suite 650
Washington, D.C.  20006
Telephone:  (202) 540-7200
Facsimile: (202) 540-7201

Gary Friedman
Tracey Kitzman
Aaron D. Patton
FRIEDMAN LAW GROUP LLP
270 Lafayette Street, 14th Floor
New York, NY 10012
Telephone: (212) 680-5150
Facsimile: (646) 277-1151

***Interim Class Counsel***